UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

NICHOLAS M. AURICCHIO,

                        Plaintiff,                    5:10-CV-1072 (GTS/ATB)

v.

TOWN OF DeWITT; TOWN OF DeWITT POLICE
DEP'T; EUGENE J. CONWAY, Chief of Police;
BRENTON WHITE, Police Officer; and DAMAN
GAGNIER, Police Officer;

                        Defendants.
_____

APPEARANCES:                             OF COUNSEL:

OFFICE OF MICHAEL J. AURICCHIO        MICHAEL J. AURICCHIO, ESQ.
  Counsel for Plaintiff
144 Miles Avenue
Syracuse, NY 13210

OFFICE OF FRANK W. MILLER            FRANK W. MILLER, ESQ.
  Counsel for Defendants             BRYAN N. GEORGIADY, ESQ.
6575 Kirkville Road
East Syracuse, NY 13057

GLENN T. SUDDABY, United States District Judge

## MEMORANDUM-DECISION and ORDER

Currently before the Court, in this civil rights action filed by Nicholas M. Auricchio

("Plaintiff") against the five above-captioned entities and individuals ("Defendants"), are

Defendants' motion for summary judgment and/or motion to dismiss for failure to state a claim

and lack of subject-matter jurisdiction, and Plaintiff's cross-motion for summary judgment.

(Dkt. Nos. 29, 62.)  For the reasons set forth below, Defendants' motion is granted, and

Plaintiff's cross-motion is denied.

# TABLE OF CONTENTS

I.      RELEVANT BACKGROUND.........................................................................3

    A.      Plaintiff's Amended Complaint...........................................................3

    B.      Recitation of Undisputed Facts...........................................................4

        1.      First Incident.............................................................................4

        2.      Second Incident........................................................................12

        3.      Plaintiff's Arrest......................................................................21

    C.      Parties' Arguments on Their Cross-Motions.....................................22

        1.      Defendants' Memorandum of Law..........................................22

        2.      Plaintiff's Opposition Memorandum of Law...........................29

        3.      Defendants' Reply Memorandum of Law.................................31

II.     GOVERNING LEGAL STANDARDS........................................................31

    A.      Standard Governing a Motion for Summary Judgment...................31

    B.      Standard Governing a Motion to Dismiss.........................................31

    C.      Standards Governing Plaintiff's Claims and Defendants' Defenses.............32

III.    ANALYSIS...................................................................................................33

# I.     RELEVANT BACKGROUND

## A.     Plaintiff's Amended Complaint

Generally, Plaintiff's Amended Complaint asserts 21 federal and state claims arising

from his arrest for violating the Town of DeWitt's noise ordinance following his preaching in the

parking lot of, and then on the sidewalk across the street from, Holy Cross Church during the

late afternoon of Sunday, September 6, 2009.  (*See generally* Dkt. No. 16.)

More specifically, Plaintiff's Amended Complaint asserts eight federal claims under 42

U.S.C. § 1983 and the United States Constitution: (1) deprivation of freedom of speech under the

First and Fourteenth Amendments; (2) deprivation of freedom of religion under the First and

Fourteenth Amendments; (3) deprivation of due process under the Fifth and Fourteenth

Amendments; (4) false arrest, unlawful detention and confinement under the Fourth and

Fourteenth Amendments; (5) unlawful search and seizure under the Fourth and Fourteenth

Amendments; (6) excessive force under the Fourth and Fourteenth Amendments; (7) conspiracy

to deprive Plaintiff of his First, Fourth, Fifth and Fourteenth Amendment rights; and (8) failure

to instruct, supervise, control, and discipline Defendant police officers so as to deprive Plaintiff

of his rights under the First, Fourth, Fifth and Fourteenth Amendments.  (*Id*.)

In addition, Plaintiff's Amended Complaint asserts 13 state claims under the New York

State Constitution or New York State common law: (9) deprivation of freedom of speech under

Article I, section 3 of the State Constitution; (10) deprivation of freedom of religion under

Article I, section 8 of the State Constitution; (11) deprivation of due process under Article I,

section 5 of the State Constitution; (12) false arrest, unlawful detention and confinement under

Article I, section 12 of the State Constitution; (13) unlawful search and seizure under Article I,

section 12 of the State Constitution; (14) excessive force under Article I, section 12 of the State Constitution; (15) conspiracy to deprive Plaintiff of his rights under the State Constitution; (16) common law false imprisonment; (17) common law abuse of process; (18) common law failure to instruct, supervise, control, and discipline; (19) common law assault; (20) common law battery; and (21) common law negligence. (*Id.*)

## B. Recitation of Undisputed Facts

### 1. First Incident

At approximately 4:00 p.m. on Sunday, September 6, 2009, Plaintiff drove into the cul-de-sac driveway of the Holy Cross Church in the Town of DeWitt. Plaintiff came to the church to pray before a small shrine outside the entrance. Before Plaintiff left his vehicle, he saw a woman exiting the front door of the church whom he believed was dressed immodestly. In Plaintiff's own words, "[S]he was wearing incredibly tight clothing[;] she had a sleeveless top and her undergarments–her–basically, her bra straps were coming off–over–dangling over her shoulders."[1]

As Plaintiff sat in his car and the woman walked near the passenger-side of his car, he verbally confronted her through his open driver-side window (his passenger-side window being closed). In his own words, he

> told her to repent all of her sins and to dress modestly. You know, I said that you should leave–'You should not go back into the church the way you're dressed. You should leave and come back modestly dressed.' I told her that, you know, [her] actions were a seduction to married men, even boys and the priest. I may have said it brings scandal on the church.[2]

---

[1]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 3 *with* Dkt. No. 62, Attach. 5, at ¶ 3.)

[2]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 4 *with* Dkt. No. 62, Attach. 5, at ¶ 4.)

Plaintiff states that he then

> did an exorcism. I said, 'In the name of Jesus Christ, be gone, Satan and
> the fallen angels,' you know, because I felt it was a spiritual assault.  As a
> Christian, I'm allowed to do, you know, an exorcism in the name of Jesus
> Christ, which I did . . .  And then I told her to repent her sins, turn to Jesus
> Christ and be saved and to be modest. . . .

After that, the woman went back into the church.[3]

Plaintiff decided to remain in the parking lot and preach toward the church. He drove his

vehicle from the cul-de-sac in front of the church to the rear area of the church parking lot and

took up a position of what he "guesstimate[d]" was approximately 50 to 75 feet from the

church's front door.[4]  He stated that he "got out of [his] car and started preaching to people

about modesty," as people continued coming out of the church.

About that time, Rick Tschernjawski, a DeWitt resident living in a house across the street

from the church, began to hear what he characterized as "yelling" coming from the church's

parking lot.[5]  (Plaintiff characterizes his speech at the time as "preaching.")[6]  Mr. Tschernjawski

---

[3]        (*Compare* Dkt. No. 29, Attach. 3, at ¶ 5 *with* Dkt. No. 62, Attach. 5, at ¶ 5.)

[4]        (*Compare* Dkt. No. 29, Attach. 3, at ¶ 6 *with* Dkt. No. 62, Attach. 5, at ¶ 6.)

[5]        (*Compare* Dkt. No. 29, Attach. 3, at ¶ 7 [asserting fact and supporting assertion
with citation to admissible record evidence] *with* Dkt. No. 62, Attach. 5, at ¶ 7 [merely denying
personal knowledge of Mr. Tschernjawsk's location and what he heard, which is insufficient to
create a genuine dispute of material fact on a motion for summary judgment].) *See* Fed. R. Civ.
P. 56(c)(4) ("An affidavit or declaration used to . . . oppose a motion must be made on personal
knowledge, set out fact that would be admissible in evidence, and show that the affiant or
declarant is competent to testify on the matters asserted."); *see, e.g., U.S. v. 15 Black Ledge
Drive*, 897 F.2d 97, 102 (2d Cir. 1990) (affirming a summary judgment ruling and rejecting a
wife's claim of no knowledge because "a bare denial was insufficient to create a genuine triable
issue" given the apparent evidence of drug activity); *Brill v. Prudential-Bache Sec., Inc.*, 84-CV-
0846, 1985 WL 8037, at *3 (S.D.N.Y. July 29, 1985) ("In response to defendants' assertion that
the nature of the fund was plainly disclosed in the prospectus Walden gave her, Brill states only
'I do not know whether I received any prospectus for this fund, or if so, whether I received it
before or after I bought the fund.' Brill does not explain what she expects to happen between

saw Plaintiff standing in the back corner of the church parking lot and facing the front entrance of the church.[7]  Mr. Tschernjawski guesses that, at the time, Plaintiff was about 150 feet away from him.[8]

As Plaintiff defines it, "preaching" involves "speaking with a raised voice."  Even though Plaintiff was directing his speech away from Mr. Tschernjawski, the volume of Plaintiff's speech was loud enough for Mr. Tschernjawski to hear at least some of what he was saying.[9] According to Mr. Tschernjawski, Plaintiff was trying to quote scripture, but was also yelling at the people coming out of the church about dressing modestly in church and calling them bad Catholics.[10]

---

now and the time of trial that will refresh her memory. I conclude that her disclaimer of knowledge is insufficient to raise a material issue of fact with respect to disclosure of the nature of Chancellor Futures Fund II.").

[6]     (Dkt. No. 62, Attach. 5, at ¶ 7; Dkt. No. 16, at ¶ 23 [Plf.'s Verified Am. Compl.].)

[7]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 7 *with* Dkt. No. 62, Attach. 5, at ¶ 7.)

[8]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 7 *with* Dkt. No. 62, Attach. 5, at ¶ 7.)

[9]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 9 *with* Dkt. No. 62, Attach. 5, at ¶ 9 [denying merely that Mr. Tschernjawski could "clearly hear everything" that Plaintiff was saying].)  The Court notes that it rejects Plaintiff's attempt to use the existence of a genuine dispute about whether Plaintiff used foul language as grounds for finding a genuine dispute about whether Mr. Tschernjawski could hear at least some of what Plaintiff was saying.  For example, Mr. Tschernjawski testified that Plaintiff was trying to quote scripture–a fact that Plaintiff does not specifically controvert.  *See, supra,* note 10 of this Decision and Order.

[10]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 10 *with* Dkt. No. 62, Attach. 5, at ¶ 10 [denying merely that Plaintiff used foul language and that the people coming out of the church were "churchgoers"]; *see also* Dkt. No. 29, Attach. 4, at ¶ 14 [Affid. of Tschernjawski, testifying that Plaintiff was yelling at the people coming out of the church about dressing modestly in church and calling them bad Catholics].).

In the church parking lot, one man, who had come out of the church, drove up to Plaintiff and asked, "What are you doing and why are you here?"[11]  In response, Plaintiff told the man that "I'm doing what John the Baptist would have done. . . .  I'm a preacher . . . .  People don't want to hear my preaching because they're predicting of their sins."[12]  Plaintiff then admonished a woman sitting in the front seat of the same car because she was smoking a cigarette.[13]  Plaintiff claims the man got out of the car, physically threatened Plaintiff and butted him with his chest; however, the man was eventually stopped by another man who had come out of the church.[14]  Plaintiff states that he then performed another exorcism, this time on the aggressive man: "I did an exorcism because when someone attacks me, I feel it was a spiritual assault. And I said, 'In the name of Jesus Christ, be gone, devils . . . .'"[15]

After the man drove way, Plaintiff was approached by a woman, whom he told to "dress modestly."[16]  In addition, the driver of a TLC van looked over at Plaintiff, and Plaintiff believes that driver may have called the police.[17]

---

[11]    (*Compare* Dkt. No. 29, Attach. 3, at ¶ 11 *with* Dkt. No. 62, Attach. 5, at ¶ 11 [denying merely that the man was a "churchgoer"].)

[12]    *See, supra,* note 11 of this Decision and Order. (*See also* Dkt. No. 29, Attach. 2, at 93-95 [attaching pages "24" through "26" of Plf.'s Rule 50-h Hrg.].)

[13]    (*Compare* Dkt. No. 29, Attach. 3, at ¶ 12 *with* Dkt. No. 62, Attach. 5, at ¶ 12 [denying merely that the people who had come out of the church were "churchgoers"].)

[14]    *See, supra,* note 13 of this Decision and Order.

[15]    (*Compare* Dkt. No. 29, Attach. 3, at ¶ 13 *with* Dkt. No. 62, Attach. 5, at ¶ 13.)

[16]    (Dkt. No. 29, Attach. 2, at 97-99 [attaching pages "28" through "30" of Plf.'s Rule 50-h Hrg.].)

[17]    (Dkt. No. 29, Attach. 2, at 96-99 [attaching pages "27" through "30" of Plf.'s Rule 50-h Hrg.].)

From his location across the street from the front of the church, Mr. Tschernjawski saw some of the people coming out of the front entrance of the church appear to hurry to their cars (with some young children appearing to clutch their mothers), and other people appear to come out of the front entrance of the church briefly but then turn around and go back inside; from his location at the rear of the church parking lot, Plaintiff saw none of those things.[18]

Watching the incident from in front of his house, Mr. Tschernjawski thought Plaintiff was loud and might be disturbed; so he decided to call 911 on his cell phone.[19] When Mr. Tschernjawski was talking to the 911 operator, he described the volume of Plaintiff' voice, held the phone toward the church for a few seconds, then put it back to his ear; he remembers the 911 operator saying, "Yeah, I could hear him," or something similar.[20]

---

[18]     (*See* Dkt. No. 29, Attach. 4, at ¶¶ 17-18 [Affid. of Tschernjawski]; Dkt. No. 62, Attach. 2, at ¶¶ 26-27 [Affid. of Plf.].)  Plaintiff's denial of what was or was not happening at the front entrance of the church is not sufficient to raise a genuine dispute regarding that fact, if he lacked personal knowledge of that fact, based on his location at the *rear* of the church parking lot.  *See, supra,* note 5 of this Decision and Order.

[19]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 16 *with* Dkt. No. 62, Attach. 5, at ¶ 16 [merely denying personal knowledge of what Mr. Tschernjawski thought, which is insufficient to create a genuine dispute of material fact on a motion for summary judgment]; *see also* Dkt. No. 29, Attach. 4, at ¶ 19 [Affid. of Tschernjawski, testifying that he decided to call 911 because he "thought the loud man might have a serious problem"].)  *See, supra,* note 5 of this Decision and Order.  When Mr. Tschernjawski called 911, his identified himself as "Richard Fiscoe" (using the last name of his girlfriend, who co-owned the house with her ex-husband), because, as Mr. Tschernjawski subsequently explained to a police officer, "It's a pain in the ass to spell [his own] name," which the officer said he understood.  (Dkt. No. 63, Attach. 9, at 7, 65-67, 83-84, 99-100 [Depo. of Tschernjawski].)

[20]     (Dkt. No. 29, Attach. 4, at ¶¶ 20-21 [Affid. of Tschernjawski, testifying that, he "described [to the 911 operator] the yelling"]; Dkt. No. 63, Attach. 9, at 44-45 [Depo. of Tschernjawski].)  Plaintiff's argument that the 911 operator's statement is inadmissible hearsay is incorrect.  That statement (which explains that Plaintiff was speaking loud enough for the call operator to hear) is not hearsay, because it falls within the exception for present sense impressions.  *See* Fed. R. Evid. 803(1) (permitting a court to admit as an exception to the hearsay rule "[a] statement describing or explaining an event or condition made while or immediately

Three police officers from the Town of DeWitt Police Department (the "Police Department") arrived in the church parking lot approximately 5 to 20 minutes after Plaintiff began preaching.[21] Two of the three officers were Officers Brenton White and Stacey Wickes.[22] While Plaintiff does not identify Officer Senus as the third officer,[23] the remainder of the record

---

after the declarant perceived it"); 30C Michael H. Graham, *Federal Practice & Procedure* § 7042, n.7 (2d ed. 2012) ("Under the language of Rule 803(1), an in court witness may thus testify that another person made a statement to him over the telephone describing an event the declarant was perceiving such as 'John, you know I just saw a police car go past my house at about 60 miles an hour without having his siren on.'"). In addition, Plaintiff's argument that the 911 Event History does not corroborate the fact that the 911 operator made the statement is unavailing. The 911 Event History (which does not contain a transcription of Mr. Tschernjawski's conversation with the 911 operator) also does not controvert the fact that the 911 operator made the statement. (*See generally* Dkt. No. 63, Attach. 4.) Indeed, to the contrary, the 911 Event History expressly and repeatedly states, under the "Remarks" section, that Plaintiff "IS SCREAMING." (*Id.* at 5, 7 [emphasis in original].)

[21]     (Dkt. No. 29, Attach. 2, at 98 [attaching page "29" of Plf.'s Rule 50-h Hrg, stating that the police arrived 10 to 15 minutes after he started preaching]; Dkt. No. 63, Attach. 9, at 47 [Depo. of Tschernjawski, stating that Plaintiff had been in the parking lot preaching for 15 to 20 minutes before the police showed up]; Dkt. No. 63, Attach. 9, at 47-48 [Depo. of Tschernjawski, stating that Plaintiff's preaching in the parking lot stopped when the police showed up, which was "like ten" minutes after Plaintiff had started preaching]; Dkt. No. 63, Attach. 9, at 56 [Depo. of Tschernjawski, stating that Plaintiff had been in the parking lot preaching for 5 minutes before the police showed up]; Dkt. No. 29, Attach. 2, at 88-91 [attaching pages "19" through "21" of Plf.'s Rule 50-h Hrg., indicating that he started preaching after moving his car, shortly after he confronted a woman at around 4:00 p.m.]; Dkt. No. 63, Attach. 4, at 5-7 [911 Event History, indicating that Mr. Tschernjawski made 911 call at 4:32 p.m.]; Dkt. No. 29, Attach. 4, at ¶ 22 [Affid. of Tschernjawski, stating that the police arrived two or three minutes after his phone call]; Dkt. No. 63, Attach. 9, at 56 [Depo. of Tschernjawski, stating that he called the police the first time about three minutes after watching Plaintiff preach].)

[22]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 18 *with* Dkt. No. 62, Attach. 5, at ¶ 18 [not specifically controverting this fact].)

[23]     (Dkt. No. 62, Attach. 2, at ¶ 13 [Affid. of Plf., stating that he "never saw officer Senus at the scene" and that he does "not identify him as the [third] officer"].) The Court notes that, since the events in question, Officer Senus has lost all of his hair, has probably lost around 20 pounds, and has gained some tattoos. (Dkt. No. 63, Attach. 12, at 66-67 [Depo. of Senus].)

evidence indicates that Officer Senus was the third officer.[24]

When Officer White first approached Plaintiff, Plaintiff stopped preaching and reacted politely.[25]  One of the officers asked him (among other things) what Plaintiff was doing, to which Plaintiff responded (among other things) that he was doing what John the Baptist would have done, and that he felt the Catholic Church had given him permission to preach on Sundays.[26] Plaintiff also described his feelings about the immodest woman in the church and stated as follows (among other things):

> If I don't take a stand–. . . I saw this . . . very immodest woman. . . .  Her
> bra straps were showing. . . . If I don't take a stand, Peter–. . .  Jesus said
> to Peter, 'Upon this rock, I found this church and the gates of hell shall not
> prevail against it.' So . . . if I don't take a stand, you know, against the sin
> and the church, then the gates of hell shall prevail against the church. . . .
> I'm taking a stand and I'm preaching to repentance.[27]

One of the officers said, "Well, you're yelling. You're disturbing the neighbors."[28]  One of the officers suggested, "Why don't you go in and talk to the parishioners in the church?"[29]  Plaintiff

---

[24]     (Dkt. No. 29, Attach. 5, at ¶ 16 [Affid. of White]; Dkt. No. 29, Attach. 6, at ¶¶ 7-16 [Affid. of Senus]; Dkt. No. 63, Attach. 4, at 7-8 [911 Event History, indicating that Unit "3402C" containing Employee "1060420" arrived at scene]; Dkt. No. 29, Attach. 5, at 11 [Police Report, stating that "Unit 3402C . . . assisted with the call"]; Dkt. No. 64, Attach. 1, at 8 [Unit History, indicating that Unit "3402C" containing Employee "1060420" responded to this incident]; Dkt. No. 63, Attach. 12, at 42-44, 46 [Depo. of Senus, stating that, during the time in question, his Post was "3402C" and his Shield Number was "DW0420"]; *cf.* Dkt. No. 63, Attach. 9, at 163-64 [Depo. of Tschernjawski, stating that Senus was at the scene for "a while" but not "all that long"].)

[25]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 19 *with* Dkt. No. 62, Attach. 5, at ¶ 19.)

[26]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 20 *with* Dkt. No. 62, Attach. 5, at ¶ 20.)

[27]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 21 *with* Dkt. No. 62, Attach. 5, at ¶ 21.)

[28]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 22 *with* Dkt. No. 62, Attach. 5, at ¶ 22.)

[29]     (Dkt. No. 29, Attach. 2, at 102 [attaching page "33" of Plf.'s Rule 50-h Hrg.].)

responded, "Well, I don't think they want me coming into the church. . . . I don't think that is appropriate."[30]

One of the officers walked to the front entrance of the church to talk with church leaders.[31] The church leaders complained that Plaintiff was causing a disturbance due to, among other things, the volume of his voice.[32] As the officer spoke with church leaders, one of the other officers stayed with Plaintiff, chatted with him, and even inquired whether he might be interesting in joining the priesthood.[33] When the officer returned from speaking with four men dressed in suits who had identified themselves as church leaders, the officer told Plaintiff that the church leaders (including the priest) had requested the officer to ask Plaintiff to leave the premises because he was causing a disturbance, and had requested that Plaintiff be arrested for

---

[30]    (Dkt. No. 29, Attach. 2, at 102-03 [attaching pages "33" and "34" of Plf.'s Rule 50-h Hrg.].)

[31]    (*Compare* Dkt. No. 29, Attach. 3, at ¶ 24 *with* Dkt. No. 62, Attach. 5, at ¶ 24; *see also* Dkt. No. 62, Attach. 4, at ¶ 6 [Affid. of Father Vavonese, stating, "I remember speaking to the police about the possible arrest of this individual, but at this time, I do not recall all the details of that conversation"].)  The Court rejects Plaintiff's objection that this affidavit testimony of Father Vavonese is "either inadmissible hearsay or false statements."  (Dkt. No. 72, Attach. 1, at 33, n.4 [Plf.'s Opp'n Memo. of Law].)

[32]    (Dkt. No. 29, Attach. 5, at ¶ 20 [Affid. of White, stating that the four church leaders, to whom he spoke, "stated that the man outside was causing a disturbance"]; Dkt. No. 62, Attach. 4, at ¶¶ 4-6 [Affid. of Father Vanonese, stating, that he was "made aware there was a man in the parking lot who was loud," that he requested police assistance regarding that individual, and that he spoke to the police about the possible arrest of the individual]; Dkt. No. 29, Attach. 5, at 11 [Police Report].)  Again, the Court rejects Plaintiff's objection that this affidavit testimony of Father Vavonese is "either inadmissible hearsay or false statements." (Dkt. No. 72, Attach. 1, at 33, n.4 [Plf.'s Opp'n Memo. of Law].)

[33]    (*Compare* Dkt. No. 29, Attach. 3, at ¶ 25 *with* Dkt. No. 62, Attach. 5, at ¶ 25.)

trespassing if he did not go willingly.[34]

Plaintiff complied without delay; he returned to his van and drove away from the church.[35] Believing the problem was over, the officers also left the scene.[36]

## 2. Second Incident

Plaintiff left, but he did not go far. He pulled his van onto the side street closest to the Holy Cross Church and parked along the side of the road. He walked back to East Genesee Street (on which Holy Cross Church sits). In that area, there is a sidewalk bordering the south side of East Genesee Street.[37] Plaintiff crossed the three lanes of East Genesee Street, and took up a position across the street from the church, on a sidewalk bordering the north side of East Genesee Street. From that location, Plaintiff again preached toward the church, this time admittedly in a "loud" or "pretty loud[]" voice.[38]

---

[34] (*Compare* Dkt. No. 29, Attach. 3, at ¶ 26 [asserting fact and supporting assertion with accurate record citations] *with* Dkt. No. 62, Attach. 5, at ¶ 26 [merely denying the identity of the officer in question, and denying that the four men spoken to by the officer were actually "church leaders"]; *see also* Dkt. No. 63, Attach. 11, at 13-16, 54 [Depo. of White].)

[35] (*Compare* Dkt. No. 29, Attach. 3, at ¶ 27 *with* Dkt. No. 62, Attach. 5, at ¶ 27 [merely denying the identity of the officer who asked him to leave].)

[36] (*Compare* Dkt. No. 29, Attach. 3, at ¶ 28 *with* Dkt. No. 62, Attach. 5, at ¶ 28 [merely denying the identity of the third officer who left the scene].)

[37] (Dkt. No. 29, Attach. 2, at 118 [attaching page "49" of Plf.'s Rule 50-h Hrg.]; Dkt. No. 63, Attach. 9, at 37, 46, 55, 57 [Depo. of Tschernjawski].)

[38] (*Compare* Dkt. No. 62, Attach. 5, at ¶ 30 [merely denying that Paragraph 27 of his Amended Complaint or Paragraph *28* of Mr. Tschernjawski's affidavit state that the preaching was "loud"] *with* Dkt. No. 29, Attach. 4, at ¶ *29* [Affid. of Tschernjawski, swearing that Plaintiff was preaching "very loudly"] *and* Dkt. No. 29, Attach. 2, at 122-23 [attaching pages "53" and "54" of Plf.'s Rule 50-h Hrg., admitting that "[a] preacher has to speak loudly. I wouldn't call it screaming, but I was speaking very–pretty loudly. . . . [P]reaching in a loud way." ]; *see also* Dkt. No. 63, Attach. 7 [indicating that the segment of East Genesee Street has three lanes–one eastbound, one westbound, and one lane for passing].)

Plaintiff preached about what he characterizes as "repentance to Catholics in general," stating things such as "Repent your sins. Return to Jesus Christ. Be saved and be holy people, and not an unholy people."[39] In addition, he kept speaking about his First Amendment rights and saying, "I am not on private property."[40]

Mr. Tschernjawski heard Plaintiff preaching again.[41] Plaintiff was located on the sidewalk in front of the border between Mr. Tschernjawski's house and his next-door neighbor's house.[42] Plaintiff's voice was louder than it was before the police had left.[43]

---

[39]     (Dkt. No. 62, Attach. 5, at ¶ 31 [admitting part of fact]; Dkt. No. 29, Attach. 2, at 122 [attaching page "53" of Plf.'s Rule 50-h Hrg., admitting remainder of fact].)

[40]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 31 [asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 62, Attach. 5, at ¶ 31 [not specifically denying fact]; *see also* Dkt. No. 29, Attach. 2, at 119, 124 [attaching pages "50" and "56" of Plf.'s Rule 50-h Hrg., admitting that he stated, among other things, that "I'm planning to preach here on the public sidewalk . . ." and that "I'm exercising my freedom of speech and religion on a public sidewalk . . . ."].)

[41]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 32 *with* Dkt. No. 62, Attach. 5, at ¶ 32.)

[42]     (Dkt. No. 29, Attach. 2, at 119-20 [attaching pages "50" and "51" of Plf.'s Rule 50-h Hrg.]; Dkt. No. 63, Attach. 9, at 57-58 [Depo. of Tschernjawski, stating that Plaintiff "crossed over towards the front of [his] house," that he was preaching "on the sidewalk in front of [his] neighbor's house" but "coming up toward my house," so that "[h]e was between my house and [his neighbor's] house"]; Dkt. No. 29, Attach. 4 [Ex. A to Affid. of Tschernjawski, attaching video/audio]; *cf.* Dkt. No. 29, Attach. 4, at ¶ 28 [Affid. of Tschernjawski, stating that, at one point, he saw Plaintiff "right in front of [his] house"].)

[43]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 31 [asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 62, Attach. 5, at ¶ 31 [not specifically denying fact]; *see also* Dkt. No. 29, Attach. 2, at 91-92, 122-24 [attaching pages "22," and "23," "53," "54" and "55" of Plf.'s Rule 50-h Hrg., admitting that, when he preached the first time, he did so in a voice that he "believed" would sufficient for people to hear him about 50 to 75 feet away, but, when he preached the second time, he did so in a voice that was "more than likely" sufficient for people to hear him about 150 to 200 yards away, which was "very–pretty loudly. . . . in a loud way" ].) The Court rejects Plaintiff's argument that his deposition testimony regarding the distance between himself and the church is inadmissible as speculative and unsupported by an adequate foundation. *See, infra,* note 48 of this Decision and Order. In any event, Plaintiff's

Plaintiff saw a man (who was Mr. Tschernjawski) come out of one of the nearby houses holding a cell phone; Plaintiff assumed the man intended to call the police to make a complaint.[44] In Plaintiff's own words, the man with the cell phone "looked like he was, you know, maybe a little upset that I was preaching there." Plaintiff directed words to the man, saying, "I'm exercising my freedom of speech and religion and I know I have a right to preach from a public sidewalk."[45] Plaintiff also said to the man, "I have a right to be here."[46] (In addition to having a master's degree in public administration, Plaintiff has a juris doctor degree.)[47]

Plaintiff kept preaching about what he characterizes as "repentance to Catholics in general." In addition, he again kept speaking about his First Amendment rights and saying, "I am not on private property."[48]

---

subsequent estimation of that distance in an affidavit–225 feet–is still larger than the 50-to-75 distance across which he was preaching in the parking lot. (Dkt. No. 62, Attach. 2, at ¶ 29 [Affid. of Plf.].)

[44]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 33 *with* Dkt. No. 62, Attach. 5, at ¶ 33; *see also* Dkt. No. 29, Attach. 2, at 120-21 [attaching pages "51" and "52" of Plf.'s Rule 50-h Hrg.,

[45]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 35 *with* Dkt. No. 62, Attach. 5, at ¶ 35.)

[46]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 35 [asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 62, Attach. 5, at ¶ 35 [not specifically denying fact].)

[47]     (Dkt. No. 29, Attach. 2, at 74, 75 [attaching pages "5" and "6" of Plf.'s Rule 50-h Hrg.].)

[48]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 36 [asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 62, Attach. 5, at ¶ 36 [not specifically denying fact]; *see also* Dkt. No. 29, Attach. 2, at 119, 124 [attaching pages "50" and "56" of Plf.'s Rule 50-h Hrg., admitting that he stated, among other things, that "I'm planning to preach here on the public sidewalk . . ." and that "I'm exercising my freedom of speech and religion on a public sidewalk . . . ."].)

Plaintiff does not deny preaching loudly at that time. He explains as follows:

> [W]hen I preach, I–it's not like I'm talking to an individual where I don't have to speak loudly. A preacher has to speak loudly. I wouldn't call it screaming, but I was speaking very – pretty loudly. . . . 'A voice crying in the desert.' John the Baptist, he would cry repentance. So maybe that would be a good way to describe it. But I wouldn't call it crying, just preaching in a loud way.

In his deposition, Plaintiff testified that, from his new position across East Genesee Street, he was approximately 150 to 200 yards from the front of the church.[49] Subsequently, in an affidavit, Plaintiff testified that he was only about 75 yards from the front of the church.[50]

_____

[49]     (Dkt. No. 29, Attach. 2, at 123-24, 139 [attaching pages "54," "55" and "70" of Plf.'s Rule 50-h Hrg.].) The Court rejects Plaintiff's argument that his deposition testimony regarding the distance between himself and the church is inadmissible as speculative and unsupported by an adequate foundation. For the sake of brevity, the Court will set aside that Plaintiff's subsequent affidavit testimony suffers from the same alleged defect. More important is the fact that Plaintiff (a resident of Syracuse, and a graduate of Bishop Ludden High School, the undergraduate program at Syracuse University, and the Maxwell School at Syracuse University) was sufficiently familiar with the church and its front area, having been inside of the church, having just crossed the street between the church and the sidewalk, and having gauged the tone of his voice to cover the distance between him and the people leaving the church. (Dkt. No. 29, Attach. 2, at 74, 75, 79-81, 118, 121-23 [attaching pages "5," "6," "10," "11," "12," "49," "52," "53" and "54" of Plf.'s Rule 50-h Hrg.].) It has long been established that a witness so familiarized need to actually measure a distance, in order to estimate it. *See, e.g., Gulf, C. & S. F. R. Co. v. Washington*, 49 F. 347, 350 (8th Cir. 1892) ("A witness familiar with the track of the defendant's road at the place where the cattle were killed was asked how far cattle on the track could be seen in each direction by the engineer or other person on the track from the point where they were killed. The objection to this question–that it called for the opinion of the witness–was rightly overruled. . . . These are matters of common knowledge, about which experts have no advantage over laymen; and to hold that a witness could not testify to the distance between objects . . . unless he had actually measured the distance, would entail intolerable expense and delay in the administration of the law, and frequently result in a total failure of criminal as well as civil justice.").

[50]     (Dkt. No. 62, Attach. 2, at ¶ 29 [Affid. of Plf.].)

As he preached, Plaintiff intended his voice to be loud enough so that the people coming out of the church probably would have been able to hear him.[51]  Moreover, in addition to directing his speech at the people coming out of the church, Plaintiff directed to everybody around him, including Mr. Tschernjawski.[52]

Mr. Tschernjawski perceived Plaintiff's voice as loud, and believes that it was indeed loud enough that people coming out of the church would have been able to hear Plaintiff.[53]  Mr. Tschernjawski perceived Plaintiff's speech as being louder than the noise from any passing traffic, which he testified was "real slow" at that time, and absent of trucks.[54]

---

[51]    (Dkt. No. Dkt. No. 16, ¶ 23 [Plf.'s Verified Am. Compl., stating that Plaintiff preaches in a tone of voice sufficient for "his message [to] be heard," which "helps facilitate dialogue with others"]; Dkt. No. 29, Attach. 2, at 122-24 [attaching pages "53," "54" and "55" of Plf.'s Rule 50-h Hrg., admitting that, when he preached the second time, he did so in a voice that was "more than likely" sufficient for people to hear him about 150 to 200 yards away, and that "when I preach, I–it's not like I'm talking to an individual where I don't have to speak loudly"].)

[52]    (Dkt. No. 29, Attach. 6. at ¶¶ 29-30 [Affid. of Senus]; Dkt. No. 29, Attach. 2, at 137 [attaching page "68"" of Plf.'s Rule 50-h Hrg., admitting, "When I preach, I preach not only to the people in the church, but everybody around.  So if [Mr.  Tschernjawsk] is outside and–I don't deny it–I would–I'm preaching to him, too, because I call all to repentance."].)

[53]    (Dkt. No. 63, Attach. 9, at 133, 154-55, 158-59 [Depo. of Tschernjawski, testifying that voice was loud]; Dkt. No. 29, Attach. 4, at ¶ 31 [Affid. of Tschernjawski, testifying that voice was loud enough for people coming out of church to hear]; *cf.* Dkt. No. 62, Attach. 2, at ¶ 28 [Affid. of Plf., stating merely that the people coming out of the church "ignor[ed]" him].)

[54]    (Dkt. No. 63, Attach. 9, at 59, 158-59 [Depo. of Tschernjawski]; Dkt. No. 29, Attach. 4, at ¶¶ 16, 29 [Affid. of Tschernjawski]; Dkt. No. 29, Attach. 4 [Ex. A to Affid. of Tschernjawski, attaching video/audio].)  The Court finds no merit in Plaintiff's counsel's (unspecified) objection before Mr. Tschernjawski gave this testimony in his objection.  (Dkt. No. 63, Attach. 9, at 59, 158-59 [Depo. of Tschernjawski].)  In addition, the Court finds nothing in this testimony to be contradicted by Mr. Tschernjawski's prior testimony that, *generally*, traffic can sound loud to him on that segment of East Genesee Street when he is outside of his house, due to the volume and speed of traffic.  (Dkt. No. 63, Attach. 9, at 112-15 [Depo. of Tschernjawski].)

Mr. Tschernjawski called 911 again.[55]  During that call, he again complained about the volume of Plaintiff's speech and that he thought Plaintiff might be disturbed.[56]

Approximately five to ten minutes after Plaintiff resumed his preaching, two officers who responded to his initial behavior in the church parking lot returned to the scene.[57]  One of the officers was Officer White.[58]  While neither Plaintiff nor Mr. Tschernjawski identify Officer Senus as the other officer,[59] the remainder of the record evidence indicates that Officer Senus

[55]      (*Compare* Dkt. No. 29, Attach. 3, at ¶ 37 *with* Dkt. No. 62, Attach. 5, at ¶ 37.) The second time Mr. Tschernjawski called 911, the operator spelled his name as "Rick Fifco." (Dkt. No. 63, Attach. 4, at 2 [911 Event History].) Mr. Tschernjawski believes this was a typographical error by the operator, given that he had again given his last name as "Fiscoe," and he believed the operator was the same one as before.  (Dkt. No. 63, Attach. 9, at 59, 66-67 [Depo. of Tschernjawski]; Dkt. No. 29, Attach. 4, at ¶ 36 [Affid. of Tschernjawski].)

[56]      (Dkt. No. 63, Attach. 4, at 7-8 [911 Event History, stating that, during second 911 call, Mr. Tschernjawski  "STATE[D] [THAT THE] POLICE JUST LEFT–[AND THAT THE] MALE IS SCREAMING"]; Dkt. No. 29, Attach. 4, at ¶¶ 29-34 [Affid. of Tschernjawski]; Dkt. No. 63, Attach. 9, at 58-59, 66 [Depo. of Tschernjawski].)

[57]      (Dkt. No. 29, Attach. 2, at 124 [attaching page "55" of Plf.'s Rule 50-h Hrg., identifying time period as "approximately five to ten minutes"]; Dkt. No. 16, ¶ 29 [Plf.'s Verified Am. Compl., identifying time period as "[w]ithin approximately ten minutes"]; *cf.*  Dkt. No. 63, Attach. 4, at 3, 8 [911 Event History, indicating that more than 8 minutes elapsed between when the first event "CLOSED" at 4:50:00 p.m. and when the police first reappeared on the scene at 4:58:02 p.m.]; Dkt. No. 63, Attach. 9, at 55-57, 59 [Depo. of Tschernjawski, stating that, after the police left, Plaintiff preached from the sidewalk in front of the church for "a few minutes" before crossing the street, after which time Mr. Tschernjawski called the 911 operator]; Dkt. No. 29, Attach. 4, at ¶ 37 [Affid. of Tschernjawski, stating that the police had arrived "[w]ithin just a couple of minutes" after he talked to the 911 operator].)

[58]      (*Compare* Dkt. No. 29, Attach. 3, at ¶ 41 *with* Dkt. No. 62, Attach. 5, at ¶ 41.)

[59]      (Dkt. No. 62, Attach. 2, at ¶ 13 [Affid. of Plf., stating that he "never saw officer Senus at the scene" and that he does "not identify him as the [third] officer"]; Dkt. No. 63, Attach. 9, at 163-64 [Depo. of Tschernjawski, stating that he does not remember seeing Senus at the scene when the officers returned].)  Again, the Court notes that, since the events in question, Officer Senus has lost all of his hair, has probably lost around 20 pounds, and has gained some tattoos.  (Dkt. No. 63, Attach. 12, at 66-67 [Depo. of Senus].)

was the other officer.[60]

When the officers passed Plaintiff in their vehicles in the north lane of East Genesee Street, they slowed down and saw Plaintiff on the sidewalk preaching.[61] The officers parked their vehicles and approached Plaintiff. Officer White saw that Plaintiff was on the same side of the street as several houses, and that several residents of the nearby houses were standing outside their homes watching the man.[62]

After the officers walked up to Plaintiff, they told him, "You're making a disturbance."[63]

---

[60]     (Dkt. No. 29, Attach. 5, at ¶¶ 33, 38, 42-44, 46, 48, 52 [Affid. of White]; Dkt. No. 29, Attach. 6, at ¶¶ 17-38 [Affid. of Senus]; Dkt. No. 63, Attach. 4, at 3-4 [911 Event History, indicating that Unit "3402C" containing Employee "1060420" arrived at scene]; Dkt. No. 29, Attach. 5, at 11 [Police Report, stating that "Unit 3402C also responded to this incident"]; Dkt. No. 64, Attach. 1, at 8 [Unit History, indicating that Unit "3402C" containing Employee "1060420" responded to this incident]; Dkt. No. 63, Attach. 12, at 42-44, 46 [Depo. of Senus, stating that, during the time in question, his Post was "3402C" and his Shield Number was "DW0420"].)

[61]     (Dkt. No. 29, Attach. 2, at 124-25 [attaching pages "55" and "56" of Plf.'s Rule 50-h Hrg., stating, "When they slowed up, they–they drove from east to west on my side of the street that I was preaching on and they stopped, maybe, 15 feet from where I was preaching and I stopped preaching again and I let them walk up to me and they then said that, you know, 'You're making a disturbance'"]; Dkt. No. 29, Attach. 5, at ¶¶ 30, 34 [Affid. of White, stating that he saw Plaintiff as he approached the church in his vehicle, and that he "immediately noticed" that Plaintiff was preaching again]; Dkt. No. 63, Attach. 9, at 62, 101-02 [Depo. of Tschernjawski, testifying that it was not until the police "showed up" by "pull[ing] up" that Plaintiff stopped preaching].)

[62]     (Dkt. No. 29, Attach. 5, at ¶ 35 [Affid. of White]; Dkt. No. 63, Attach. 11, at 7-8, 36-37 [Depo. of White]; *cf.* Dkt. No. 29, Attach. 6, at ¶¶ 23-25 [Affid. of Senus]; Dkt. No. 29, Attach. 2, at 118-19, 123, 137 [attaching pages "49," "50" "54," and "68" of Plf.'s Rule 50-h Hrg.].)

[63]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 42 *with* Dkt. No. 62, Attach. 5, at ¶ 42; *see also* Dkt. No. 29, Attach. 2, at 124-25 [attaching pages "55" and "56" of Plf.'s Rule 50-h Hrg., stating, "[T]hey stopped, maybe, 15 feet from where I was preaching and I stopped preaching again and I let them walk up to me and they then said that, you know, 'You're making a disturbance'"].)

Plaintiff responded, "I'm exercising my freedom of speech and religion on a public sidewalk and it's a violation of my rights for you to stop me."[64] The officers listened to Plaintiff as he "went into details about [his] rights of freedom and religion and speech under the Federal Constitution."[65] Plaintiff also warned the officers not to "cross the line" by arresting him.[66] Plaintiff told the officers that his brother was an attorney and they would be sued if they arrested him.[67] Officer White responded that Plaintiff was causing a disturbance (for which he could be stopped).[68]

One of the officers spoke to Mr. Tschernjawski, who complained to the officer that Plaintiff was, among other things, "screaming profanities" and disturbing the sense of peace and quiet that he was enjoying.[69] The officer returned and told Plaintiff that the neighbors were disturbed by his yelling about underwear.[70] In response, Plaintiff "immediately" turned toward the direction Tschernjawski as a "knee jerk reaction" and said–in a voice that the officers

---

[64]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 46 *with* Dkt. No. 62, Attach. 5, at ¶ 46.)

[65]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 47 *with* Dkt. No. 62, Attach. 5, at ¶ 47.)

[66]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 47 *with* Dkt. No. 62, Attach. 5, at ¶ 47.)

[67]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 48 *with* Dkt. No. 62, Attach. 5, at ¶ 48.)

[68]     (Dkt. No. 29, Attach. 5, at ¶ 40 [Affid. of White]; Dkt. No. 29, Attach. 2, at 129-30 [attaching pages "60" and "61" of Plf.'s Rule 50-h Hrg.].)

[69]     (Dkt. No. 63, Attach. 9, at 62, at 64 [Depo. of Tschernjawski, testifying that he told the officer that Plaintiff was, among other things, "screaming profanities" while Mr. Tschernjawski was "sit[ting] out on [his] sun porch to relax"]; Dkt. No. 29, Attach. 5, at 11 [Police Report]; Dkt. No. 29, Attach. 6. at ¶¶ 27, 29-30 [Affid. of Senus].)

[70]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 50 *with* Dkt. No. 62, Attach. 5, at ¶ 50.)

perceived as yelling–"Liars, that's not true."[71]  Plaintiff then turned back toward the church and resumed preaching, stating loudly, "Repent. Turn to Jesus Christ and be saved."[72]

The officers put Plaintiff in handcuffs, placed him in the back of Officer White's patrol car, and informed him he was being detained, not arrested.[73]

### 3. Plaintiff's Arrest

---

[71]     (Dkt. No. 29, Attach. 2, at 137-38 [attaching pages "68" and "69" of Plf.'s Rule 50-h Hrg., admitting, "To the best of my [recollection], I don't believe I said he was a liar. *I don't recall specifically.* I believe what I said was, 'I did not say that.' That is what I believe I said and *I looked in his direction* at them, when he–you know, just a *knee jerk reaction* –and then I just immediately turned–as I turned, I just looked over. . . . [T]o be honest with you, *I don't recall the exact words at that point*."] [emphasis added]; Dkt. No. 29, Attach. 5, at ¶¶ 46-47 [Affid. of White]; Dkt. No. 29, Attach. 5, at 11 [Police Report]; Dkt. No. 63, Attach. 11, at 24-25 [Depo. of White]; Dkt. No. 29, Attach. 6. at ¶¶ 29-30 [Affid. of Senus]; *cf.* Dkt. No. 29, Attach. 4, at ¶ 44 [Affid. of Tschernjawski, stating, "He did keep yelling, and the officers drew their handcuffs . . ."].)  Despite Plaintiff's argument to the contrary, his testimony that "[t]o the best of [his] [recollection]" he does not "believe" he said "liar" is insufficient to create a genuine dispute of material fact on the issue, especially given that he clarified that "[he does not] recall specifically" and that "[he does not] recall the exact words at that point."  *See, supra,* note 5 of this Decision and Order.  Moreover, Plaintiff's testimony that he made the remark "like I'm talking [in the deposition]" is insufficient to controvert that the officers perceived him to be yelling, especially given that Plaintiff admits directing the comment past the officers, in the vicinity of Mr. Tschernjawski.  (*See* Dkt. No. 29, Attach. 2, at 137-38 [attaching pages "68" and "69" of Plf.'s Rule 50-h Hrg.].) Finally, the fact that Mr. Tschernjawski did not perceive that particular comment as directed *at him* specifically does not create a genuine dispute of material fact as to whether Plaintiff indeed yelled in the direction of Mr. Tschernjawski.  Indeed, Plaintiff himself admits that he does not know if Mr. Tschernjawski heard him.  (Dkt. No. 29, Attach. 2, at 138 [attaching page "69" of Plf.'s Rule 50-h Hrg., stating, "I don't think he even would've heard me"].)

[72]     (*Compare* Dkt. No. 29, Attach. 3, at ¶ 51 *with* Dkt. No. 62, Attach. 5, at ¶ 51; *see also* Dkt. No. 29, Attach. 2, at 124-25 [attaching pages "55" and "56" of Plf.'s Rule 50-h Hrg., stating, "And then I turned and I–towards the church and I said, 'Repent–' I said this loudly, 'Repent. Turn to Jesus Christ and be saved.'"] [emphasis added]; Dkt. No. 16, at ¶ 37 [Plf.'s Verified Compl., stating, "Auricchio then turned toward the Church and said loudly: '... repent of your sins. Turn to Jesus Christ and be saved.'"].)

[73]     (*Compare* Dkt. No. 29, Attach. 3, at ¶¶ 52-53 *with* Dkt. No. 62, Attach. 5, at ¶¶ 52-53.)

For approximately five minutes, the officers discussed the situation as Plaintiff sat in Officer White's patrol car.[74] While Plaintiff did not observe the officers make a cell phone call, and Mr. Tschernjawski testified that one of the officers "maybe . . . might have been on his cell phone" but he could not remember, the remainder of the evidence indicates that they made such a call to their supervisor, Sergeant Damon Gagnier, who was located several miles away.[75]

The officers decided to charge Plaintiff with violating the Town's noise ordinance.[76] The Town's noise ordinance expressly prohibits the following noises, among others: "Annoying sounds: . . . any noise which causes public inconvenience, annoyance or alarm or disturbs the public's peace, comfort or tranquility." Town of DeWitt Code § 126-6(13).[77] Regarding the penalties for such offenses, the Town's noise ordinance states as follows, in pertinent part:

> Any person who shall violate any of the provisions of this chapter shall be guilty of a violation pursuant to the Penal Law and shall be punishable by a fine of not more than two hundred fifty dollars ($250) or imprisonment for not more than fifteen (15) days, or both.

Town of DeWitt Code § 126-7.[78]

Officer White returned to his car, transported Plaintiff to the DeWitt police station, and

---

[74]    (*Compare* Dkt. No. 29, Attach. 3, at ¶ 53 [asserting the fact and supporting that assertion with accurate record citations] *with* Dkt. No. 62, Attach. 5, at ¶ 53 [not specifically denying the fact asserted].)

[75]    (Dkt. No. 29, Attach. 5, at ¶ 52 [Affid. of White]; Dkt. No. 29, Attach. 6, at ¶ 36 [Affid. of Senus]; Dkt. No. 29, Attach. 7, at ¶¶ 15-18 [Affid. of Gagnier]; Dkt. No. 63, Attach. 10, at 21-27, 30-32, 34, 43, 46, 115 [ Depo. of Gagnier]; *cf.* Dkt. No. 29, Attach. 5, at 11 [Police Report, indicating that the officer present at the scene other than Officer White somehow spoke with Sergeant Gagnier during the time in question].)

[76]    (*Compare* Dkt. No. 29, Attach. 3, at ¶ 55 [asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 62, Attach. 5, at ¶ 55 [not specifically denying fact].)

[77]    (Dkt. No. 29, Attach. 2, at 67.)

[78]    (Dkt. No. 29, Attach. 2, at 67-68.)

placed him in a holding cell.[79]  Officer White searched Plaintiff's pockets, questioned him for basic biographical information, and eventually issued him an appearance ticket for violating the Town's noise ordinance.  In all, Plaintiff was in custody for about 75 to 90 minutes.

Once Plaintiff was free to leave, he was driven by Officer White back to his parked car near the Holy Cross Church.

### C.  Parties' Arguments on Their Cross-Motions

#### 1.  Defendants' Memorandum of Law

Generally, in their memorandum of law, Defendants' assert the following eighteen arguments.  (*See generally* Dkt. No. 29, Attach. 1, at 15-70 [attaching pages "3" through "58" of Defs.' Memo. of Law].)

First, Defendants argue, to the extent that Plaintiff's claims against Defendant Gagnier are premised on that Defendant's alleged presence at the scene of the arrest, those claims should be dismissed for lack of personal involvement because based on the current record there is no genuine dispute that those claims mistake Defendant Gagnier with Defendant Senus.  (*Id*. at 15-16 [attaching pages "3" and "4" of Defs.' Memo. of Law].)

Second, Defendants argue, the noise ordinance survives Plaintiff's facial freedom-of-speech challenge under the First Amendment, because based on the current record there is no genuine dispute that the noise ordinance (a) is facially content neutral, (b) is narrowly tailored to serve a legitimate governmental interest, (c) permits alternative channels for expression, (d) is not a prior restraint on protected speech, and (d) does not confer unbridled discretion on law enforcement officials.  (*Id*. at 16-24 [attaching pages "4" through "12" of Defs.' Memo. of Law].)

_____

[79]      (*Compare* Dkt. No. 29, Attach. 3, at ¶¶ 56, 58 [asserting facts and supporting fact with accurate record citations] *with* Dkt. No. 62, Attach. 5, at ¶¶ 56, 58 [not specifically denying facts].)

Third, Defendants argue, the noise ordinance survives Plaintiff's as-applied freedom-of-speech challenge under the First Amendment, because based on the current record there is no genuine dispute that (a) the Town did not enforce the noise ordinance in a content-based manner, (b) the noise ordinance is narrowly tailored in the context of street preaching or as applied to Plaintiff, and (c) Plaintiff had plentiful alternative channels for communication. (*Id*. at 24-33 [attaching pages "12" through "21" of Defs.' Memo. of Law].)

Fourth, Defendants argue enforcing the noise ordinance did not violate Plaintiff's state constitutional freedom-of-speech rights. (*Id*. at 33-35 [attaching pages "21" through "23" of Defs.' Memo. of Law].)

Fifth, Defendants argue, enforcing the noise ordinance did not violate Plaintiff's federal constitutional freedom-of-religion rights because such rights do not relieve Plaintiff of the obligation to comply with a valid and neutral law of general applicability, such as the noise ordinance. (*Id*. at 35-37 [attaching pages "23" through "25" of Defs.' Memo. of Law].)

Sixth, Defendants argue, enforcing the noise ordinance did not violate Plaintiff's state constitutional freedom-of-religion rights. (*Id*. at 37-38 [attaching pages "25" through "27" of Defs.' Memo. of Law].)

Seventh, Defendants argue, the noise ordinance survives Plaintiff's state and federal constitutional vagueness challenges, because based on the current record there is no genuine dispute that (a) the "annoying sounds" provision in the ordinance is not unconstitutionally vague when read in the context of the whole noise ordinance, (b) the noise ordinance is similar to other noise ordinances that have survived vagueness challenge, (c) the New York Court of Appeals would give the noise ordinance a constitutional construction as applied, and (d) as applied, the noise ordinance provided sufficient notice to Plaintiff that excessive yelling near the church was prohibited. (*Id*. at 39-47 [attaching pages "27" through "35" of Defs.' Memo. of Law].)

Eighth, Defendants argue, Defendant police officers did not falsely arrest Plaintiff under the Fourth Amendment, because based on the current record there is no genuine dispute that (a) probable cause existed to arrest Plaintiff, and (b) probable cause still exists even if this Court holds that the "annoying sounds" provision of the noise ordinance is unconstitutionally vague. (*Id*. at 47-50 [attaching pages "35" through "38" of Defs.' Memo. of Law].)

Ninth, Defendants argue, Officer White did not improperly search Plaintiff's pockets under the Fourth Amendment because  based on the current record there is no genuine dispute that the search was a routine one incident to a lawful arrest.  (*Id*. at 50 [attaching page "38" of Defs.' Memo. of Law].)

Tenth, Defendants argue, the arresting officers did not apply excessive force against Plaintiff in violation of the Fourth Amendment, because based on the current record there is no genuine dispute that (a) Plaintiff's alleged handcuff injuries were de minimis, (b) Plaintiff's short wait in an allegedly hot police car was not unreasonable, and (c) even if the arresting officers lacked probable cause to arrest Plaintiff, their physical contact with him did not violate his Fourth Amendment rights.  (*Id*. at 50-53 [attaching pages "38" through "41" of Defs.' Memo. of Law].)

Eleventh, Defendants argue, Plaintiff's state law police misconduct claims fail for the same reasons as do his Fourth Amendment claims.  (*Id*. at 54 [attaching page "42" of Defs.' Memo. of Law].)

Twelfth, Defendants argue Plaintiff's common law police misconduct claims fail for the same reasons as do his Fourth Amendment claims, because based on the current record there is

no genuine dispute that (a) Plaintiff's assault and battery claims are identical to his federal excessive force claim, and (b) Defendant officers' probable cause for arrest provides a complete defense to Plaintiff's false imprisonment claim. (*Id*. at 54-56 [attaching pages "42" through "44" of Defs.' Memo. of Law].)

Thirteenth, Defendants argue, Plaintiff's federal failure-to-train claim against Defendant Conway (the Chief of Police) fails as a matter of law, because (a) Defendant Police Department is not a valid Defendant under 42 U.S.C. § 1983, (b) Plaintiff has not alleged facts plausibly suggesting that Defendant Conway was personally involved in the constitutional violations alleged or that he caused Plaintiff to be deprived of a federal right, and (c) as pled in his Amended Complaint, Plaintiff's failure-to-train claim improperly relies on only a single incident of alleged deprivation of rights. (*Id*. at 56-59 [attaching pages "44" through "47" of Defs.' Memo. of Law].)

Fourteenth, Defendants argue, Plaintiff's negligent-supervision claim against Defendant Town and Defendant Conway (the Chief of Police) fails as a matter of law because (a) a prerequisite of this claim is a successful false arrest claim and excessive force claim (neither of which are successful in this action), and (b) based on the current record evidence there is no genuine dispute that the Town neither knew nor should have known of any Defendant officer's propensity for the conduct which caused the injury' prior to the injury's occurrence. (*Id*. at 59-60 [attaching pages "47" and "48" of Defs.' Memo. of Law].)

Fifteenth, Defendants argue, Defendant police officers did not maliciously abuse the process of law, because based on the current record there is no genuine dispute that Defendant officers used legal process against him in order to obtain a collateral objective that is outside the legitimate ends of the process. (*Id*. at 61-64 [attaching pages "49" through "51" of Defs.' Memo.

of Law].)

Sixteenth, Defendants argue, the arresting officers did not conspire to deprive Plaintiff of his rights, because (a) Plaintiff's federal conspiracy claim fails to allege facts plausibly suggesting a meeting of the minds between two or more state actors (in part due to the intra-enterprise conspiracy doctrine), or an actual deprivation of an underlying constitutional right, (b) Plaintiff's state law conspiracy claim does not exist, and (c) Plaintiff did not list conspiracy in his notice of claim thus depriving the Court of subject-matter jurisdiction over that conspiracy claim. (*Id*. at 63-66 [attaching pages "51" through "54" of Defs.' Memo. of Law].)

Seventeenth, Defendants argue, Plaintiff's negligence claim should be dismissed because (a) to the extent that the claim is asserted against Defendant Town and Conway, it is redundant of Plaintiff's negligent supervision claim previously discussed, and (b) to the extent that the claim is asserted against the arresting officers, that claim does not allege facts plausibly suggesting anything other than improper police conduct, which is not an act of negligence. (*Id*. at 66-67 [attaching pages "54" and "55" of Defs.' Memo. of Law].)

Eighteenth and finally, Defendants argue, based on the current record there is no genuine dispute that Defendant White is protected from liability as a matter of law by the doctrine of qualified immunity with regard to five of Plaintiff's claims, specifically, Plaintiff fourth claim (for false arrest and unlawful detention under federal law), his fifth claim (for unlawful search and seizure under federal law), his twelfth claim (for false arrest and unlawful detention under state law), his thirteenth claim (for unlawful search and seizure under state law), and his sixteenth claim (for false imprisonment under state law), because it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged action. (*Id*. at 67-70 [attaching pages "55" through "58" of Defs.' Memo. of Law].)

Familiarity with the particular nature of each of these arguments is assumed in this Decision and Order, which is intended primarily for the review of the parties.

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in his opposition memorandum of law, Plaintiff asserts the following twelve arguments. (*See generally* Dkt. No. 62, Attach. 1, at 12-55 [attaching pages "6" through "49" of Plf.'s Opp'n Memo. of Law].)

First, Plaintiff argues, he should be granted leave to withdraw all claims against Defendant Gagnier, and to file a Second Amended Complaint asserting a new claim of conspiracy against him, in light of the fact that Plaintiff's assertion of his claims against Defendant Gagnier in his Amended Complaint was due to the now-apparent fact that Defendant White "misrepresented" in a police report that Defendant Gagnier was at the scene during the time in question. (*Id.* at 12 [attaching page "6" of Plf.'s Opp'n Memo. of Law].)

Second, Plaintiff argues, he should be granted leave to withdraw his second, sixth, eighth, tenth, fourteenth, fifteenth, sixteenth, eighteenth, nineteenth, twentieth and twenty-first causes of action against Defendants "in order to promote judicial expediency of this civil action." (*Id.* at 13 [attaching page "7" of Plf.'s Opp'n Memo. of Law].)

Third, Plaintiff argues, he should be granted leave to file a Second Amended Complaint, in order to assert a new conspiracy claim against Defendants, arising from "new information, obtained during the discovery process, regarding the DeWitt police officers' alleged involvement in an ongoing conspiracy outside the scope of their employment." (*Id.* at 13 [attaching page "7" of Plf.'s Opp'n Memo. of Law].)

Fourth, Plaintiff argues, the noise ordinance is unable to survive Plaintiff's facial or as-applied freedom-of-speech challenges under the First and Fourteenth Amendments, because (a)

the noise ordinance is a facially content-based law (as evident from the fact that it provides exceptions for church bells and public sporting/entertainment events but not for preaching), and (b) the noise ordinance is unconstitutional as applied to Plaintiff (as evident from the fact that, for example, Defendants admit in the responses to Plaintiff's Request for Admissions that the Town never offered Plaintiff an alternative venue to continue his preaching). (*Id*. at 13-33 [attaching pages "7" through "27" of Plf.'s Opp'n Memo. of Law].)

Fifth, Plaintiff argues, the noise ordinance is a violation of Plaintiff's right to freedom of speech under the State Constitution. (*Id*. at 34 [attaching page "28" of Plf.'s Opp'n Memo. of Law].)

Sixth, Plaintiff argues, the noise ordinance cannot survive Plaintiff's state and federal constitutional vagueness challenges because, (a) the Town "probably intended" the "annoying sounds" provision of Section 126-6(A)(13) to be read in conjunction with the "maximum permitted noises" provision of Section 126-4 but never established minimal guidelines to govern law enforcement in doing so, and (b) Plaintiff was not given proper notice of the alleged prohibited activity of yelling near a church because Section 126-6(A)(6) applies only when that church is "in session," which does not occur during a birthday party. (*Id*. at 35-41 [attaching pages "29" through "35" of Plf.'s Opp'n Memo. of Law].)

Seventh, Plaintiff argues, Defendant White falsely arrested, confined and detained Plaintiff under the Fourth Amendment, because (a) they handcuffed him and confined him a vehicle before formally arresting him, and (b) they could not possibly have had probable cause to arrest him before they formally arrested him. (*Id*. at 41-46 [attaching pages "35" through "40" of Plf.'s Opp'n Memo. of Law].)

Eighth, Plaintiff argues, Defendant White committed an improper search and seizure

against Plaintiff under the Fourth Amendment, because while Plaintiff was in a holding area in the DeWitt police station Defendant White seized Plaintiff's wallet, keys and rosary beads to prevent him from preaching in the future. (*Id*. at 47-48 [attaching pages "41" and "42" of Plf.'s Opp'n Memo. of Law].)

Ninth, Plaintiff argues, Defendant White falsely arrested, unlawfully detained, and confined Plaintiff under the State Constitution. (*Id*. at 48 [attaching page "42" of Plf.'s Opp'n Memo. of Law].)

Tenth, Plaintiff argues, Defendant White committed an improper search and seizure against Plaintiff under the State Constitution. (*Id*. at 49 [attaching page "43" of Plf.'s Opp'n Memo. of Law].)

Eleventh, Plaintiff argues, Defendant White maliciously abused the process of law under the New York State common law. (*Id*. at 49-51 [attaching pages "43" through "45" of Plf.'s Opp'n Memo. of Law].)

Twelfth, and finally, Plaintiff argues, Defendant White is not entitled to qualified immunity on any causes of action because it was not objectively reasonable for him to believe that his actions were lawful at the time of the challenged action. (*Id*. at 51-54 [attaching pages "45" through "48" of Plf.'s Opp'n Memo. of Law].)

### 3. Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants' assert the following four arguments. (*See generally* Dkt. No. 66, at 4-12 [attaching pages "1" through "9" of Defs.' Reply. Memo. of Law].)

First, Defendants argue, Plaintiff's arguments on his facial freedom-of-speech and due process claims under the First and Fourteenth Amendments are unavailing, because (a)

Plaintiff's focus on two exemptions in the noise ordinance (i.e., for church bells and public sporting/

entertainment events) do not sufficiently challenge the particular subsection under which he was charged (i.e., the "annoying sounds" provision of Section 126-6[13]), and (b) the decibel limits established in Section 126-4 of the noise ordinance and the list of prohibited noises in Section 126-6 of the noise ordinance does not somehow render the "annoying sounds" provision of Section 126-6(13) impermissibly vague. (*Id*. at 4-5 [attaching pages "1" and "2" of Defs.' Reply. Memo. of Law].)

Second, Defendants argue, the Second Circuit's recent decision in *Costello v. City of Burlington* suggests that summary judgment is also appropriate on Plaintiff's as-applied claim under the First Amendment, because (a) evidence exists that Defendant officers merely told Plaintiff to lower his voice (not to be silent), (b) based on the current record there is no genuine dispute that Plaintiff's voice was heard more than 220 feet away, dominated the area, and was not subsumed by any of the competing ambient noise, and (c) based on the current record there is no genuine dispute that Plaintiff's noise impinged on the use of the neighborhood by others with equal claim. (*Id*. at 6-9 [attaching pages "3" through "6" of Defs.' Reply. Memo. of Law].)

Third, Defendants argue, it is clear that, *Costello v. City of Burlington,* qualified immunity is appropriate for Defendant White and all other individual Defendants. (*Id*. at 9-10 [attaching pages "6" and "7" of Defs.' Reply. Memo. of Law].)

Fourth and finally, Defendants argue, the Court should not give weight to Plaintiff's reliance on Defendants' erroneous response to one of Plaintiff's requests for admission, because it (a) was but one response to more than 200 such requests, (b) was in error (in that in accidentally neglected to give a bifurcated response to a compound question), and (c) was

plainly inconsistent with the existing testimony in the record. (*Id*. at 10-12 [attaching pages "7"

through "9" of Defs.' Reply. Memo. of Law].)

II.     **GOVERNING LEGAL STANDARDS**

    A.     **Standard Governing a Motion for Summary Judgment**

    Because the parties to this action have demonstrated, in their memoranda of law, an

accurate understanding of the legal standard governing motions for summary judgment under

Fed. R. Civ. P. 56, the Court will not recite that well-known legal standard in this Decision and

Order, but will direct the reader to the Court's recent decision in *Pitts v. Onondaga County*

*Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby,

J.), which accurately recites that legal standard.

    The Court would add only that Local Rule 7.1(a)(3) of the Local Rules of Practice for

this Court requires that the nonmoving party file a response to the moving party's Statement of

Material Facts, which admits or denies *each* of the moving party's factual assertions in matching

numbered paragraphs, and supports any denials with a specific citation to the record where the

factual issue arises. N.D.N.Y. L. R. 7.1(a)(3). It further provides that, to the extent that the

nonmoving party fails to do so, the facts asserted in the movant's Statement of Material Facts

will be deemed admitted, as long as they are supported by the record. *Id*.

    B.     **Standard Governing a Motion to Dismiss**

    Because the parties to this action have demonstrated, in their memoranda of law, an

accurate understanding of the legal standard governing dismissals for failure to state a claim

pursuant to Fed. R. Civ. P. 12(b)(6), the Court will not recite that well-known legal standard in

this Decision and Order, but will direct the reader to the Court's decision in *Wade v. Tiffin*

*Motorhomes, Inc.*, 05-CV-1458, 2009 WL 3629674, at *3-5 (N.D.N.Y. Oct. 27, 2009) (Suddaby,

J.), which accurately recites that legal standard.

With regard to the standard governing a motion to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), "[i]t is a fundamental precept that federal courts are courts of limited jurisdiction." *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978). Generally, a claim may be properly dismissed for lack of subject-matter jurisdiction where a district court lacks constitutional or statutory power to adjudicate it. *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000). A district court may look to evidence outside of the pleadings when resolving a motion to dismiss for lack of subject-matter jurisdiction. *Makarova*, 201 F.3d at 113. The plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence. *Makarova*, 201 F.3d at 113 (citing *Malik v. Meissner*, 82 F.3d 560, 562 [2d Cir. 1996]). When a court evaluates a motion to dismiss for lack of subject-matter jurisdiction, all ambiguities must be resolved and inferences drawn in favor of the plaintiff. *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (citing *Makarova*, 201 F.3d at 113).

C.      **Standards Governing Plaintiff's Claims and Defendants' Defenses**

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standards governing Plaintiff's claims and Defendants' defenses in this action, the Court will not recite, in their entirety, those legal standards in this Decision and Order, which (again) is intended primarily for review by the parties.

### III.    ANALYSIS

After carefully considering the matter, the Court agrees with Defendants that Plaintiff's Amended Complaint should be dismissed for each of the numerous alternative reasons stated in Defendants' memoranda of law. (*See generally* Dkt. No. 29, Attach. 1, at 15-70 [attaching pages "3" through "58" of Defs.' Memo. of Law]; Dkt. No. 66, at 4-12 [attaching pages "1" through "9" of Defs.' Reply. Memo. of Law].)  *See, supra,* Parts I.C.1. and I.C.3. of this Decision and Order (summarizing those reasons).  To those reasons the Court adds the following nine points.

First, in Part I.B. of this Decision and Order, the Court has resolved some *purported* factual disputes in favor of Defendants (e.g., whether it was Defendant Gagnier or Defendant Senus who was present at the scene, whether Plaintiff "yelled" or simply spoke "in a raised voice," whether the 911 operator heard him over Mr. Tschernjawski's cell phone, whether the four men in suits who one of the officers spoke to were actually "church leaders," whether they specifically complained of the volume of Plaintiff's speech, whether the distance from Plaintiff to the front of the church during the second incident was 150-200 yards or 75 yards, whether people coming out of the church actually heard Plaintiff during the second incident, whether Plaintiff said "Liars," whether the arresting officers called Defendant Gagnier on the phone, etc). However, even if the Court were to find those purported factual disputes to be genuine, the Court would still grant Defendants' motion for summary judgment, because those factual disputes would not be *material* to the ultimate disposition of Defendants' motion.

For example, it is uncontroverted that (1) during the second incident, the arresting officers witnessed Plaintiff speaking in a loud voice between a residential neighborhood and a church, (2) Plaintiff intended that his voice carry *at least* 225 feet in front of him (over a three-lane road and the area in front of the church) as well as far enough to reach at least one neighbor

behind him (to whom he turned at least twice, (3) Mr. Tschernjawski heard Plaintiff's loud voice (despite any competing ambient noise) and *twice* complained that the loud voice was impinging on his use of the neighborhood, (4) several residents of the nearby houses were standing outside their homes watching Plaintiff as he spoke in that loud voice, (5) Plaintiff (an attorney) had repeatedly been warned that he was causing a disturbance due to his loud voice, and (6) he nonetheless kept speaking in that loud voice. That is enough for the officers to find probable cause that Plaintiff had violated the Town's noise ordinance. Moreover, there is no admissible record evidence from which a rational fact finder could conclude that the officers were arresting Plaintiff (or taking any action against him) based on the content of his speech, rather than the volume of that speech. Finally, whether it was Defendant Sensus or Defendant Gagnier (or perhaps some other officer) who aided Defendant White is ultimately of no consequence. Indeed, if it was not Defendant Senus, then he should be dismissed from this action due to his lack of personal involvement in the constitutional violations alleged.

Second, liberally construed, Plaintiff's request to voluntarily dismiss his claims against Defendant Gagnier in his Amended Complaint appears to be implicitly conditioned on the Court's granting of his request for leave to file a new claim (for conspiracy) against Defendant Gagnier in a Second Amended Complaint. (Dkt. No. 62, Attach. 1, at 12 [attaching page "6" of Plf.'s Opp'n Memo. of Law].) Because the Court has already denied Plaintiff's request for leave to file that Second Amended Complaint (Dkt. No. 75), the Court will deem Plaintiff's request to voluntarily dismiss his claims against Defendant Gagnier as withdrawn. This does not end the Court's inquiry into the matter, however, because Defendants have requested the dismissal of those claims on the ground of lack of personal involvement. (Dkt. No. 29, Attach. 1, at 15-16 [attaching pages "3" and "4" of Defs.' Memo. of Law].) By failing to oppose Defendants'

request for the dismissal of these claims, Plaintiff has lightened Defendants' burden with regard to that request;[80] and (at the very least) Defendants have met their modest threshold burden with regard to that request. The Court notes that Plaintiff's statement that Defendant White "misrepresented" in a police report that Defendant Gagnier was at the scene during the time in question is a mischaracterization; rather, what appears to have happened is that, in his haste and zeal to vindicate the wrong he perceived to have occurred against him, Plaintiff simply misinterpreted that police report.

Third, Plaintiff's request to voluntarily dismiss eleven claims against Defendants (i.e., his second, sixth, eighth, tenth, fourteenth, fifteenth, sixteenth, eighteenth, nineteenth, twentieth, and twenty-first claims) does not specify whether the dismissal of those claims should be with prejudice or without prejudice. (Dkt. No. 62, Attach. 1, at 13 [attaching page "7" of Plf.'s Opp'n Memo. of Law].) Because Defendants have taken the time and incurred the expense of filing a motion for summary judgment with regard to those claims, the Court finds that it is proper for the dismissal to be with prejudice, pursuant to Fed. R. Civ. P. 41(a)(2).[81] In the alternative, the

---

[80] In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n. 1 (N.D.N.Y.Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n. 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases); *Cea v. Ulster Co.*, 309 F. Supp.2d 321, 335 n. 14 (N.D.N.Y. 2004) (Scullin, C.J.) (granting summary judgment to defendants with regard to claim that plaintiff failed to address in his opposition to defendants' motion for summary judgment); *Frink Am., Inc. v. Champion Road Mach. Ltd.*, 48 F. Supp.2d 198, 209 (N.D.N.Y. 1999) (McAvoy, C.J.) ("Plaintiff does not address these claims in its opposition papers, leading the Court to conclude that it has abandoned them)(citing cases).

[81] *See Pilgrim v. Bruce*, 05-CV-0198, 2008 WL 2003792, at *7 (N.D.N.Y. May 7, 2008) (Report-Recommendation of Lowe, M.J., adopted by Sharpe, J.) ("I do not believe it

Court bases its dismissal of these claims on the fact that, again, by failing to oppose Defendants' request for the dismissal of these claims, Plaintiff has lightened Defendants' burden with regard to that request; and (at the very least) Defendants have met their modest threshold burden with regard to that request.

Fourth, the Court rejects the second part of Plaintiff's fourth argument in opposition to Defendants' motion (i.e., that Defendants have admitted in their responses to Plaintiff's Request for Admissions that the Town never offered Plaintiff an alternative venue to continue his preaching) on the additional ground that, after Plaintiff made that argument, United States Magistrate Judge Andrew T. Baxter permitted Defendants to withdraw and amend their responses to Plaintiff's requests for admission. (Dkt. No. 73.) In addition, the Court notes that there is no admissible evidence in the record from which a rational fact finder could conclude that Plaintiff was in any way prohibited from communicating his message by (1) creating a large sign and erecting it on the public sidewalk bordering either the north or south side of East Genesee Street, (2) passing out fliers or leaflets at the same location, (3) entering the church to discuss his concerns with church leaders, or (4) simply speaking in a lower voice from the public sidewalk bordering the south side of East Genesee Street.

Fifth, the Court rejects the first part of Plaintiff's seventh argument in opposition to Defendants' motion (i.e., that the officers violated the Fourth Amendment by handcuffing him and confining him a vehicle before formally arresting him) on the additional ground that, for an

---

would be at all proper to permit Plaintiff to expressly assert claims of 'defamation of character' and interference with his right to 'religious services,' sit idly by as Defendants defend themselves against those claims, and then snatch those claims from the jaws of Defendants' properly filed and facially meritorious motion for summary judgment, just so that this extremely litigious plaintiff may again assert them in another action. The claims have been litigated and should be decided.").

arrest to occur, it is not necessary for the arresting officer to advise the arrestee that he is being arrested.[82]  Rather, whether an arrest has occurred depends on whether a reasonable person would have believed that he was not free to leave.[83]  Moreover, generally, the constitutional validity of an arrest turns on whether probable cause existed for the arrest (or whether it was objectively reasonable for the arresting officer to believe that he had probable cause to arrest the arrestee).[84]  That constitutional validity does not turn on whether the arrestee was informed of the arrest.[85]

Sixth, the Court rejects the second part of Plaintiff's seventh argument in opposition to Defendants' motion (i.e., that the officers could not possibly have had probable cause to arrest him before they formally arrested him) on the additional ground that probable cause can arise to arrest a defendant for a crime hours if not days before that defendant is actually arrested for that crime.[86]  For example, generally it is permissible for there to be a reasonable delay between the

---

[82]    *See, e.g., Fodelmesi v. Schepperly*, 87-CV-6762, 1992 WL 84469, at *3 (S.D.N.Y. Apr. 15, 1992) (finding that plaintiff was arrested by officer even though officer told him, "I am not arresting you").

[83]    *Fodelmesi v. Schepperly*, 1992 WL 84469, at *3.

[84]    *Fodelmesi v. Schepperly*, 1992 WL 84469, at *3.

[85]    *See Murphy v. Sr. Investigator Neuberger*, 94-CV-7421, 1996 WL 442797, at *8, n.5 (S.D.N.Y. Aug. 6, 1996) ("Although defendants allegedly never told plaintiff he was under arrest, this alleged violation of New York Criminal Procedure Law section 140.15 does not suffice as a constitutional violation."), *accord, Kondziela v. County of Erie*, 09-CV-0601, 2011 WL 4055163, at *4 (W.D.N.Y. Sept. 12, 2011).

[86]    *See United States v. Viscioso*, 711 F. Supp. 740, 745 (S.D.N.Y. 1989) ("Probable cause to arrest must exist at the moment of arrest, but may be based on earlier behavior of the person arrested. A delay of a few hours or days between the alleged commission of a crime and the arrest does not in and of itself diminish probable cause . . . ."); *cf. United States v. Watson*, 423 U.S. 411, 450, n.14 (1976) (Marshall, J., dissenting) (explaining that, while the "staleness" of information obtained by the police may pose problems in connection with a search warrant, it poses no problems in connection with an arrest warrant).

issuance of an arrest warrant and the execution of that warrant.[87]  Moreover, an officer may be

shielded from liability on a claim of false arrest due to the fact that probable cause existed to

arrest the defendant for a crime *other than* the crime for which that defendant was actually

arrested.[88]

Seventh, to the extent that Plaintiff argues that his Fourth Amendment rights were

violated because Defendants arrested him under circumstances in which he could only be given

an appearance ticket (*see* Dkt. No. 62, Attach. 5, at ¶ 57), the Court rejects that argument.  Even

if Defendants were able under the noise ordinance to only issue Plaintiff an appearance ticket

---

[87]     *See, e.g., United States v. Wilson*, 342 F.2d 782, 783 (2d Cir. 1965) (finding that four-and-one-half month delay between issuance and execution of arrest warrant was not unreasonable, and explaining that a "[d]elay by law enforcement officers in arresting a suspect does not ordinarily affect the legality of the arrest").

[88]     *See Jaegly v. Couch*, 439 F.3d 149, 154 & n.1 (2d Cir. 2006) (" New York courts [have] . . . explicitly held an arrest to be valid so long as there was probable cause to believe that the defendant was committing *some crime*, and not necessarily one of the crimes identified by the arresting officer at the time of arrest. . . .  [A] claim for false arrest turns only on whether probable cause existed to arrest a defendant[;] ... it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, *any charge actually invoked by the arresting officer at the time of arrest*.") [emphasis added]; *accord, Taylor v. City of Syracuse*, 05-CV-0750, 2009 WL 961432, at *5 (N.D.N.Y. Apr. 7, 2009) (Suddaby, J.) ("[P]robable cause does not require an awareness of a particular crime, but only that some crime may have been committed.  As a result, even assuming (for the sake of argument) that probable cause did not exist to arrest Plaintiff Taylor for disorderly conduct, that arrest is otherwise privileged or justified if probable cause existed to arrest Taylor with another offense–even if Taylor was not actually charged with that offense.") [internal quotation marks and citations omitted].  Indeed, here, the officers appear to have had probable cause to arrest Plaintiff for violating not simply Section 126(A)(13) of the Town Code but Section 126-6(A)(6) of that code.  In pertinent part, Section 126-6(A)(6) of the Town Code the following noises, among others: "any excessive noise on any street adjacent to any . . . church . . . while the same is in session . . . provided that conspicuous signs are displayed in such streets indicating that the same is a . . . church street." Town of DeWitt Code § 126-6(A)(6).  Plaintiff cites no case law in support his argument that a church is not "in session" for purposes of DeWitt Town Code § 126-6(A)(6), when, on a Sunday afternoon, it holds a function in the church's social hall, attended by (inter alia) the church's parishoners, in celebration of the birthday of the 90-year-old mother of church's priest. However, the Court will not linger on this issue given that it has already found that the officers had probable cause to arrest Plaintiff for violating Section 126(A)(13) of the Town Code.

(rather than arrest him), that fact would not give rise to a Fourth Amendment claim under 42

U.S.C. § 1983.[89]

Eighth, even if state law claims were not dismissed for reasons stated above, the Court

would decline to exercise supplemental jurisdiction over those claims after it had dismissed all

claims over which it had original jurisdiction, pursuant to 28 U.S.C. § 1367(c).

Ninth, and finally, for each of the reasons that Defendants' motion is granted, Plaintiff's

cross-motion is denied as moot and/or unsupported by a showing of cause.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment and/or motion to dismiss for

failure to state a claim and lack of subject-matter jurisdiction (Dkt. No. 29) is **<u>GRANTED</u>**; and

it is

**ORDERED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 62) is

**<u>DENIED</u>**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 16) is **<u>DISMISSED</u>**.

Dated: March 8, 2013
     Syracuse, New York

                              Hon. Glenn T. Suddaby
                              U.S. District Judge

---

[89]    *Danford v. City of Syracuse*, 09-CV-0307, 2012 WL 4006240, at *10 (N.D.N.Y. Sept. 12, 2012) (Suddaby, J.); *Picciano v. McLoughlin*, 723 F. Supp.2d 491, 503-04 (N.D.N.Y.2010) (Suddaby, J.) (relying, in part, on *Williams v. Schultz*, 06-CV-1104, 2008 WL 463 5383, at *7-9 [N.D.N.Y. Oct. 16, 2008] [Lowe, M.J.] ).